**Charles R. ORRICER, Appellant,**

v.

**Donald R. ERICKSON, Warden of the South Dakota State Penitentiary, Appellee.**

**No. 71-1516.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 6, 1972.

Decided Jan. 12, 1973.

Martin Weeks, Vermillion, S. D., for appellant.

William J. Srstka, Jr., Asst. Atty. Gen., Pierre, S. D., for appellee.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and WEBSTER, District Judge.*

BRIGHT, Circuit Judge.

Charles R. Orricer collaterally attacks his state court conviction and the resulting fifteen-year prison sentence for committing burglary in the second degree in violation of the criminal laws of South Dakota. Orricer's conviction dates back to March, 1961. The Supreme Court of South Dakota affirmed the conviction on direct appeal, State v. Orricer, 80 S.D. 126, 120 N.W.2d 528 (1963), and subsequently affirmed the denial of his petition for postconviction relief. Orricer v. State, 85 S.D. 293, 181 N.W.2d 461 (1970). After exhausting his remedies in the state courts, Orricer unsuccessfully sought relief in the federal district court through a petition for writ of habeas corpus under 28 U.S.C. § 2254, Orricer v. Erickson, 329 F.Supp. 360 (D.S. D.1971), and this appeal followed.

Orricer contends: (1) that his conviction rested on evidence unlawfully seized from an automobile under his control; (2) that he was denied a fair trial by a panel of impartial jurors; (3) that he was denied the effective assistance of counsel; (4) that he was denied the right to be present at a hearing where a state judge ordered him transferred to the state penitentiary for security purposes prior to trial; and (5) that his conviction was based on perjured testimony given by a police officer.

It appears to us that appellant's principal attack is directed at evidence allegedly seized and introduced into evidence in violation of Orricer's Fourth Amendment rights. We turn first to that issue.

## THE SEARCH AND SEIZURE

On November 13, 1960, at approximately 3:40 a. m., in Vermillion, South Dakota, police officers Paul Finley and Douglas Jorgensen, while making a routine patrol of Vermillion business places in the downtown area, looked through the front window of Tom & Bud's Super Value Store and noticed signs of a burglary attempt. The dial and handle had been removed from the store's safe and there was a brown putty-like substance along the top, bottom, and left edge of the safe-door. The door also appeared to have been beaten with a hammer or heavy object.

The officers then began checking the entrances to the store and found a door open on the southeast corner of the building. As they proceeded around the corner into an alley running north and south, they saw two men approximately 60 feet away walking in the alley. The alley area was illuminated by a street light. The two men ignored the officers' commands to halt. One of the men

* Sitting by designation.

ran north in the alley, and the other ran through the back door of a laundromat located across the alley from the supermarket. The officers fired their pistols at the two men, and although the man running north stumbled and fell, he was able to regain his footing and continue his flight. Both disappeared from the view of the policemen.

At a preliminary hearing, Officer Jorgensen identified the individual who ran north through the alley as one Lawrence Geelan. At the trial, Officer Jorgensen described the second individual that he saw in the alley. He stated that this person was much larger than the first, stood slightly over six feet tall, weighed between 190 and 200 pounds, wore dark trousers and a light yellow or gold-colored bulky-knit sweater, and also wore glasses.

Immediately following this alley confrontation with the two men suspected of participating in the burglary attempt, the police officers proceeded to the police station and by telephone notified other law enforcement officers of the incident. Then Jorgensen and the other officers began looking for the suspects in the attempted burglary by checking cars and persons in the downtown area. There was little traffic, and few people were about at that hour of the morning.

After stopping and investigating a car near the police station, Jorgensen received a radio call that another patrol car had stopped a Buick automobile a few blocks away on Franklin Street, so he and the county sheriff proceeded to that location. When the sheriff and Jorgensen arrived on the scene, the driver of the apprehended auto, appellant Orricer, was standing on the street. Jorgensen testified that he "recognized him as a man that looked and was of the same size as the man I had seen in the

alley." Although Jorgensen could not actually identify Orricer as one of the men he had encountered in the alley, he observed that Orricer was similarly attired since he was wearing dark trousers, a gold, heavy-knit sweater, and glasses, and was bare-headed.

While on the scene, Jorgensen searched the interior of the car and saw a pair of brown jersey gloves with smears of a brown, putty-like substance on the fingers and fingertips. The search also revealed a set of Iowa plates in the trunk. About 15 or 20 feet away from the car, Jorgensen found a loaded 32 calibre pistol, but this pistol was never specifically connected with appellant Orricer and was not admitted into evidence.

About five minutes after Orricer was stopped, he was taken to the police station in the police patrol car. Officer Jorgensen drove Orricer's car to the station. Later that morning, at approximately 8:30 a. m., the gloves were removed from the car without a warrant. At the trial, an expert witness identified certain paint particles found on the fingers and fingertips of these gloves as originating from the same source as samples of paint taken from the safe. He also testified that the brown substance on the gloves was the same color, odor, and composition as soap scrapings taken from the supermarket safe.

 Orricer contends that there was no justification for the investigative stop and that the police had no probable cause for his arrest; thus the seizure of the gloves and their subsequent introduction into evidence was a violation of his Fourth Amendment rights.[1]

 The Vermillion police officers who made the initial stop of the auto which Orricer was driving admitted that

---

1. Although the incidents in question occurred more than 12 years ago and prior to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the exclusionary rule nevertheless applies here since Orricer's direct appeal to the Supreme Court of South Dakota was not decided until March 13, 1963. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), teaches that the exclusionary principle announced in *Mapp* applies to state court convictions except those which had become "final" before the rendition of *Mapp* on June 19, 1961.

they did not observe Orricer violating any law, nor did these officers have a description of the car or persons being sought in connection with the burglary attempt at the supermarket in Vermillion. These officers did notice that the car bore out-of-county license plates.[2]

Notwithstanding these particular circumstances, we believe that the Vermillion police were entitled to make an investigatory stop of the automobile driven by Orricer. The facts in this case are somewhat analogous to those in Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1969). There, we held that an investigatory stop of an auto in a small town was justified when the stop was made during the early morning hours where unidentified cars did not routinely travel at that time. In describing the facts, the court noted:

> The car had out of county license plates. There had been a series of burglaries in the town. During the period of surveillance by the officers the car moved very slowly past closed business establishments and pursued a rather erratic course through the streets of the town. [*Id.* at 172.]

We concluded that these facts afforded "sufficient justification for stopping the * * * auto and requiring the occupants to identify themselves." *Id.*

Here, police officers sought to locate two suspects who had run from the scene of the crime. Although the suspects were last seen afoot, we think that it was reasonable for police to believe that the burglars might use a motor vehicle in which to carry their tools and to flee the scene of the crime. Within one hour of the crime, police discovered only two vehicles, including the one driven by Orricer, and only one or two pedestrians in the general downtown area of Vermillion. Under the circumstances, we think the police acted reasonably in stopping individuals and autos within the vicinity

of the crime for the purpose of requesting identification. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We hold that the investigative stop of the auto Orricer was driving was justified on the authority of *Carpenter, supra,* 419 F.2d 169.

■ When Officer Jorgensen arrived on the scene, his identification of Orricer by size and clothing as one of the men seen in the alley behind the burglarized store provided reasonable grounds for believing that the officers had apprehended one of the criminals. This identification furnished probable cause to arrest Orricer at that time, *see* Klingler v. United States, 409 F.2d 299 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969), and probable cause to believe that the car contained instruments or fruits of the crime. Thus the police were entitled to search the car on the spot and to remove the gloves from the car later at the police station. Chambers v. Maroney, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■■ The record is inconclusive as to whether the police arrested Orricer at the place where his car was stopped. Assuming, arguendo, that no arrest was made at the scene of this initial apprehension, we think that the search and seizure were justified, even if they were not made incident to an arrest, because the seizing officer possessed reasonable cause to believe that the contents of the automobile "offend against the law." Carroll v. United States, 267 U.S. 132, 159, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Police officers having probable cause to believe an automobile which they have stopped contains contraband or evidence of a crime may search the vehicle without a warrant. *Chambers, supra,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; *Carroll, supra,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Thunder Horse v.

2. The significance of this fact is minimal since approximately 3,000 of Vermillion's 6,000 residents (approximate 1960 population) are students at the University of South Dakota. Presumably many of these students drive cars bearing out-of-county license plates.

South Dakota, 456 F.2d 1262 (8th Cir. 1972). *See* United States v. Bozada, 473 F.2d 389 (8th Cir. 1973).[3]

We have also considered Orricer's other contentions. None of the alleged errors or defects affected the substantial rights of the appellant to a fair trial. The record discloses an insufficient basis to justify habeas corpus relief. *See* 28 U.S.C. § 2111. Accordingly we affirm the district court.

WEBSTER, District Judge, concurring, joined by MATTHES, Chief Judge.

I concur fully in the majority opinion and would affirm for an additional reason not expressed therein.

This is unquestionably a close case which relies for its result upon a carefully constructed sequential application of the teachings of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (investigative stop); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (probable cause to search); and Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970) (subsequent station house search). The keystone in this construction is *Terry*, for if the initial stop of the automobile was an unreasonable intrusion, the probable cause to search supplied by Officer Jorgensen's prompt arrival and identification of appellant Orricer would likewise fail. And absent probable cause to search at the scene, the subsequent station house search would not be sanctioned by Chambers v. Maroney, supra, but rather

would be invalid under Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S. Ct. 1472, 20 L.Ed.2d 538 (1968). Coolidge v. New Hampshire, 403 U.S. 443, 461–464, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

In Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1969), relied upon in the majority opinion, the automobile had been surveilled by the police prior to the stop. Such was not the case here, but nonetheless the totality of circumstances in this case which were known to the officer making the stop would " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" Terry v. Ohio, supra, 392 U.S. at 22, 88 S.Ct. at 1880.

If, however, our reliance on *Terry* and *Carpenter* is misplaced, I would nonetheless affirm the judgment of the district court, because I do not believe the Supreme Court, as presently constituted, would apply the Exclusionary Rule to this case as a "mechanically inflexible response".[1]

The record reveals an otherwise fair trial by jury which has resolved doubts as to Orricer's guilt. A careful review of the record discloses no basis to question the reliability of the fact finding process. The events complained of occurred almost twelve years ago.[2]

An examination of the separate dissenting opinions in Coolidge v. New Hampshire, supra, as well as the statements of the Chief Justice in *Bivens*, fn. 1 supra, convinces me that the Supreme

---

3. We do not rest our decision on the "plain view" doctrine as did the state court and the federal district court. Orricer v. State, 85 S.D. 293, 181 N.W.2d 461 (1970); Orricer v. Erickson, 329 F.Supp. 360 (D.S.D.1971). The record indicates that the search of the vehicle at the scene was thorough and purposeful.

1. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 418, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971, Burger, C. J., dissenting).

2. Chief Justice Burger, dissenting in Bivens (footnote 1, supra) observed at 403 U.S. 416 and 417, 91 S.Ct. 2014:

"Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of the high price it extracts from society—the release of countless guilty criminals. . . .

"The presumed educational effect of judicial opinions is also reduced by the long time lapse—often several years— between the original police action and its final judicial evaluation. Given a policeman's pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay."

Court would now either modify its holding in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), or refuse to apply the Exclusionary Rule in a § 2254 proceeding where, as here, there has been no colorable showing of innocence,[3] guilt is supported by independent evidence and the intrusion was not so gross as to offend those values which are "at the core of the Fourth Amendment."[4]

---

3. See Friendly, "Is Innocence Irrelevant? Collateral Attack on Criminal Judgments", 38 U. of Chi.L.Rev. 142, 160 (1970).

4. Wolf v. Colorado, 338 U.S. 25, 27, 69 S. Ct. 1359, 93 L.Ed. 1782 (1949) ; Coolidge v. New Hampshire, supra, 443 U.S. at 491, 91 S.Ct. 2022 (Harlan, J., concur-

ring). Cf. A.L.I. Model Code of Pre-Arraignment Procedure §§ SS 290.2(2) (Proposed Official Draft No. 1, April 10, 1972).