#27218-a-JMK

**2015 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                       Plaintiff and Appellee,

    v.

ARIA M. MEYER,                       Defendant and Appellant.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GREGORY J. STOLTENBURG
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ELLIE J. BAILEY
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff
                        and appellee.


DONALD M. MCCARTY of
Helsper, McCarty, Mahlke & Kleinjan, P.C.
Brookings, South Dakota                       Attorneys for defendant
                        and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 23, 2015

OPINION FILED **07/22/15**

#27218

KERN, Justice

[¶1.] South Dakota State University (SDSU) police stopped Defendant Aria Meyer and several others in a group on suspicion of underage consumption and for violating South Dakota's open container law. The State charged Meyer with underage consumption pursuant to SDCL 35-9-2 and driving under the influence (DUI) pursuant to SDCL 32-23-1(1). Meyer moved to suppress all evidence stemming from the stop. After an evidentiary hearing, the magistrate court denied the motion. Pursuant to a stipulation and agreement, Meyer was found guilty of DUI but retained the right to appeal the court's denial of her motion to suppress. Meyer appealed to the circuit court, and it affirmed. Meyer now appeals to this Court. We affirm.

*BACKGROUND*

[¶2.] Just after midnight on September 15, 2013, SDSU student patrol officers Jack Dunteman and Brennan Albrecht were on bicycle patrol on SDSU's campus. The student officers were wearing gray uniform shirts and black pants. Dunteman spotted a group of about eight individuals in a parking lot gathered around an open tailgate of a Ford Escape. The Escape's taillights were on. As Dunteman approached, he observed the group walk toward Young Hall, which primarily houses freshman and sophomore students. According to Dunteman, some of the individuals appeared to stumble and could not walk in a straight line, but he could not identify which particular students. Dunteman arrived at the Escape and smelled the odor of alcohol. Dunteman also peered in the rear driver's-side window and saw two open Coors Light cans, one sealed Coors Light can, an open container

-1-

of Bud Light Straw-Ber-Ritas, and an open bottle of UV Blue Vodka. Dunteman did not witness any of the group members consume alcohol and did not know their ages. Dunteman reported his observations to dispatch and requested a sworn officer.

[¶3.] Dunteman observed a patrol car driving nearby and, when it stopped, he spoke with SDSU Police Officer Jonathan Anderson. Dunteman told Officer Anderson that the group that had just crossed the street in front of his patrol car was the group Dunteman had been watching. By this time, the group members were standing outside of Young Hall approximately 20 feet from the east entrance closest to the parking lot. Officer Anderson, who was dressed in a black police uniform, proceeded to make contact with the group and observed that each individual appeared to have consumed alcohol.[1] Officer Brandon Schultz arrived on the scene shortly thereafter to assist Officer Anderson. Together, Officer Anderson and Officer Schultz reviewed each of the group member's driver's licenses and determined that everyone in the group was under 21 years old. Officer Anderson asked the student officers to run a license-plate check on the Escape. The vehicle was registered to Meyer. When asked to identify herself, Meyer raised her hand and stepped forward.

[¶4.] Officer Anderson took Meyer to his patrol car and asked her questions. Meyer told Officer Anderson that she, along with the other group members, had consumed alcohol that night and that she had driven the vehicle. Officer Anderson

---

1. This question of who initiated the stop was contested at the suppression hearing. Meyer and several of the group members testified that an officer on a bicycle made the stop while Dunteman and Officer Anderson testified that Officer Anderson made the stop. The court ultimately determined that Officer Anderson made the stop.

administered field sobriety tests and a preliminary breath test, both of which Meyer failed. Officer Anderson then arrested Meyer, read her the DUI advisement card, and administered a *Miranda* warning. Meyer waived her *Miranda* rights and said that she had consumed Straw-Ber-Ritas. Meyer also said she had driven the Escape and was under the influence of alcohol. Law enforcement obtained a warrant to draw her blood, and the blood draw indicated her blood alcohol content was 0.169%.

[¶5.] The State charged Meyer with DUI and underage consumption. Meyer moved the court to suppress all evidence, asserting that law enforcement lacked reasonable suspicion and probable cause to make the stop. The magistrate court held an evidentiary hearing on the motion on December 9, 2013. The magistrate court denied Meyer's motion to suppress and entered findings of fact and conclusions of law. The parties entered into a stipulation whereby Meyer agreed to waive her right to a jury trial and proceed to a court trial. In exchange, the State agreed to dismiss the underage consumption charge, and the parties agreed Meyer would preserve the right to appeal the magistrate court's decision. At the court trial on April 21, 2014, the court convicted Meyer of DUI. Meyer appealed the motion to suppress to the circuit court, and it affirmed. Meyer appeals to this Court.

[¶6.] Meyer raises one issue in this appeal:

> Whether the magistrate court and the circuit court erred in denying the motion to suppress.

*STANDARD OF REVIEW*

[¶7.]　　　"This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard." *State v. Ludemann*, 2010 S.D. 9, ¶ 14, 778 N.W.2d 618, 622 (quoting *State v. Madsen*, 2009 S.D. 5, ¶ 11, 760 N.W.2d 370, 374). "Under this standard, we review the [magistrate] court's findings of fact under the clearly erroneous standard, but we give no deference to its conclusions of law." *Id.* (quoting *State v. Haar*, 2009 S.D. 79, ¶ 12, 772 N.W.2d 157, 162).

*ANALYSIS*

[¶8.]　　　"The Fourth Amendment to the United States Constitution and Article VI, section 11 of the South Dakota Constitution protect individuals from unreasonable searches and seizures." *State v. Aaberg*, 2006 S.D. 58, ¶ 9, 718 N.W.2d 598, 600 (footnote omitted). "Generally, probable cause must exist before law enforcement is permitted to seize an individual." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 15-19, 88 S. Ct. 1868, 1876-78, 20 L. Ed. 2d 889 (1968)). "However, if law enforcement officers lack the probable cause necessary to effectuate a custodial arrest, officers may perform a brief, investigative stop based on reasonable suspicion." *State v. Mohr*, 2013 S.D. 94, ¶ 13, 841 N.W.2d 440, 444.

[¶9.]　　　We have noted that "[a]rticulating a precise definition of reasonable suspicion is 'not possible.'" *Aaberg*, 2006 S.D. 58, ¶ 10, 718 N.W.2d at 600 (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct. 1657, 1661, 134 L. Ed. 2d 911 (1996)). We apply "a common-sense and non-technical approach to determining reasonable suspicion, one that deals with the practical considerations of everyday

life." *Mohr*, 2013 S.D. 94, ¶ 14, 841 N.W.2d at 444 (quoting *State v. Sound Sleeper*, 2010 S.D. 71, ¶ 16, 787 N.W.2d 787, 791). "A reviewing court must look to the 'totality of the circumstances' to determine whether the officer had a 'particularized and objective basis' for suspecting criminal activity." *Id.* (quoting *State v. Johnson*, 2011 S.D. 10, ¶ 8, 795 N.W.2d 924, 926). "The factual basis needed to support an officer's reasonable suspicion is minimal." *Id.* However, an officer's stop cannot be "the product of mere whim, caprice, or idle curiosity." *Id.* (quoting *State v. Satter*, 2009 S.D. 35, ¶ 6, 766 N.W.2d 153, 155).

[¶10.] Meyer first argues that the magistrate court clearly erred when it found that Officer Anderson effectuated the stop. "In applying the clearly erroneous standard[,] . . . [t]he question for the appellate court 'is not whether it would have made the same findings [as] the [circuit] court did, but whether [upon review of the entire record the appellate court] is left with a definite and firm conviction that a mistake has been committed.'" *In re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 459 (1970) (quoting *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123, 89 S. Ct. 1562, 1576, 23 L. Ed. 2d 129 (1969)).

[¶11.] The magistrate court heard conflicting testimony on who stopped Meyer and the other members of the group. Colin Holler, one of the group members, testified that the group was stopped by someone on a bicycle in a police uniform. Holler further testified that they waited several minutes for a law enforcement officer to arrive in a vehicle. Another group member, Chaas Delgado, testified that it was an individual on a bicycle who stopped the group outside of Young Hall. He testified that after the person on the bicycle stopped the group, a

patrol vehicle pulled up. Delgado said he felt compelled to stop. Similarly, group member Faith Laleman stated that an individual on a bicycle asked the group to stop. According to Laleman, the student officer approached the group, said he could smell alcohol, and asked for their IDs. Later, a patrol vehicle arrived at the scene. Likewise, Meyer testified it was a bicycle officer who stopped the group, and they waited for an officer in a patrol vehicle to arrive. Delgado, Holler, and Meyer could not recall the color of the uniform worn by the officer who stopped them. Laleman said the officer wore an all-black uniform. Holler, Laleman, and Delgado testified they had been drinking that night, and each received citations for minor in consumption.

[¶12.]     Student officer Dunteman testified that he did not stop the group, but rather, that Officer Anderson made the stop. Dunteman further testified that he is only authorized to stop someone if instructed by law enforcement or if someone's life is in danger. Officer Anderson testified that he stopped the group based on the information provided by Dunteman. After hearing the conflicting testimony, observing the witnesses, and weighing their credibility and demeanor, the magistrate court determined Officer Anderson stopped the group. We give deference to the factfinder "to determine the credibility of witnesses and the weight to be given to their testimony." *Strong v. Atlas Hydraulics, Inc.*, 2014 S.D. 69, ¶ 16, 855 N.W.2d 133, 140 (citing *Peterson v. Issenhuth*, 2014 S.D. 1, ¶ 15, 842 N.W.2d 351, 355). Based upon our review of the record and giving appropriate weight to the magistrate court's ability to judge the credibility of the witnesses, we are not left

with a definite and firm conviction that a mistake has been made. The determination that Officer Anderson made the stop is not clearly erroneous.

[¶13.]    Meyer next argues that Officer Anderson lacked reasonable suspicion to make the stop. He testified that he stopped Meyer and the other members of the group based solely on what Dunteman relayed to him. "An informant's tip may carry sufficient 'indicia of reliability' to justify a *Terry* stop even though it fails to rise to the level of the probable cause needed for an arrest or search warrant." *State v. Olhausen*, 1998 S.D. 120, ¶ 7, 587 N.W.2d 715, 717-18 (citing *Alabama v. White*, 496 U.S. 325, 328, 110 S. Ct. 2412, 2415, 110 L. Ed .2d 301 (1990)). "The tip's degree of reliability depends on the quantity and quality of the tipster's information." *State v. Burkett*, 2014 S.D. 38, ¶ 47, 849 N.W.2d 624, 636 (quoting *State v. Herren*, 2010 S.D. 101, ¶ 17, 792 N.W.2d 551, 556).

[¶14.]    Here, Dunteman was an on-duty, student-patrol officer, not just an anonymous tipster.[2] Officer Anderson, therefore, had reason to trust the report received from Dunteman. Dunteman witnessed a group of individuals gathered around an open tailgate of a Ford Escape in an SDSU parking lot just past midnight.[3] As Dunteman rode his bicycle to investigate, the group started walking towards Young Hall, a dormitory primarily for freshman and sophomore students. Dunteman saw several of the group members stumble as they walked. Once

---

2.    Student patrol officers are charged with keeping the campus safe, preventing property damage, and alerting SDSU law enforcement to criminal activity.

3.    The parking lot is a campus lot requiring a parking pass issued by SDSU.

Dunteman was near the Escape, he smelled the odor of alcohol and saw containers of alcohol in the vehicle. Dunteman relayed these details to Officer Anderson.

[¶15.] Based on the totality of the circumstances presented to Officer Anderson through student officer Dunteman, Officer Anderson had a reasonable and objective basis to suspect Meyer was involved in criminal activity.[4] "The quantum of proof necessary for reasonable suspicion is somewhere above a hunch but less than probable cause." *Herren*, 2010 S.D. 101, ¶ 21, 792 N.W.2d at 557 (citing *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740 (2002)). Officer Anderson's stop of Meyer was more than a "hunch" because of the specific facts relayed to Officer Anderson by a trustworthy source. While neither Dunteman nor Officer Anderson knew the ages of the group members prior to obtaining their IDs, it was rational to infer that they were under 21 years old because the group members were on a college campus near a dormitory housing mainly freshman and sophomore students. *See Mohr*, 2013 S.D. 94, ¶ 16, 841 N.W.2d at 445 ("[O]fficers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them[.]"). Dunteman's conclusion that the group members had consumed alcohol or were intoxicated was logical and based on his observations. The totality of the circumstances suggests that Meyer was engaged in criminal activity. Officer Anderson had an articulable and rational basis to briefly stop the group, including Meyer, and investigate whether criminal activity was afoot.

---

4. SDCL 35-9-2 provides in part: "It is a Class 2 misdemeanor for any person under the age of twenty-one years to purchase, attempt to purchase, or possess or consume alcoholic beverages. . . ."

[¶16.] Lastly, Meyer asserts Officer Anderson did not have a particularized or individualized suspicion to believe Meyer was involved in criminal activity because it was impossible to ascertain which group members had potentially violated the law based on the facts of this case. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S. Ct. 447, 452, 148 L. Ed. 2d 333 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.");[5] *accord Mohr*, 2013 S.D. 94, ¶ 14, 841 N.W.2d at 444 (requiring officers to have particularized basis for suspecting criminal activity).

[¶17.] Meyer cites *Commonwealth v. Mistler*, 912 A.2d 1265 (Pa. 2006) to support her argument. In *Mistler*, undercover officers attended a large, fraternity-house party where they witnessed suspected under-aged students consuming alcohol. *Id.* at 1267-68. The officers observed a bartender at a makeshift bar handing out drinks to people "youthful in appearance" in the basement of the fraternity house. *Id.* at 1268. Once backup arrived, all of the partygoers were separated into two groups, those over 21 and those under 21. *Id.* All 56 of the under-age partygoers were issued citations. *Id.* After balancing the government's interest in crime prevention, the individuals' liberty interest against unreasonable searches and seizures, and the public's interest, the court held that it could "identify

---

5.   In *City of Indianapolis*, the city set up a series of checkpoints "to interdict unlawful drugs." 531 U.S. at 35, 121 S. Ct. at 451. The Supreme Court had previously carved out limited exceptions to the individualized suspicion requirement for sobriety and border checkpoints because of "the magnitude of the State's interest" in safety and policing its borders. *Id.* at 38-39, 121 S. Ct. at 452-53. However, the Supreme Court held that drug checkpoints violated the Fourth Amendment "[b]ecause the primary purpose of the Indianapolis checkpoint program [was] ultimately indistinguishable from the general interest in crime control." *Id.* at 48, 121 S. Ct. at 458.

no factor that elevates the level of public concern regarding underage drinking beyond that of 'a general interest in crime control.'" *Id.* at 1272. The Pennsylvania court noted that the United States Supreme Court "has not condoned suspicionless searches where the program is aimed at uncovering evidence of ordinary criminal wrongdoing." *Id.* at 1272 (citing *City of Indianapolis*, 531 U.S. at 42-43, 121 S. Ct. at 455).[6] Thus, the Pennsylvania court held that law enforcement's actions did "not comport with constitutional requirements" and all evidence had to be suppressed. *Id.* at 1273-74.

[¶18.] The present case is distinguishable. While it is true that the students were in a group, Officer Anderson, based on information received from Dunteman, had an individualized suspicion to stop each member of the group based on the totality of the circumstances. Dunteman observed each of the eight group members gathered around the tailgate of the Ford Escape with the taillights illuminated. Upon investigation, the area behind the tailgate smelled of alcohol, Dunteman saw multiple opened and unopened alcohol containers in the Ford Escape, and several of the members stumbled as they walked away. Unlike *Mistler*, each group member was observed in the immediate and particular area connected to the suspected illegality. Furthermore, Meyer's group remained intact and cohesive until Officer Anderson conducted the investigatory stop. In *Mistler*, on the other hand, not every partygoer had been observed within the immediate and particular area of the suspected illegality, and the large group did not remain intact or cohesive.

---

6. While generalized and suspicionless stops may be appropriate in some instances (e.g., border or DUI checkpoints), no such policy existed in the *Mistler* case. 912 A.2d at 1273.

[¶19.]     This case did not involve a "suspicionless search" aimed at "general crime control" or discovering "ordinary criminal wrongdoing." *See id.* at 1273. Law enforcement officials and campus police do not have *carte blanche* authority to perform stops or searches *en masse* wherever a group of individuals is gathered. Here, the State was able to prove that Officer Anderson stopped Meyer because he had a reasonable and particularized suspicion to believe that she was involved in criminal activity. The stop was not "the product of mere whim, caprice, or idle curiosity." *See Mohr*, 2013 S.D. 94, ¶ 13, 841 N.W.2d at 444. Therefore, upon consideration of the totality of the circumstances, we hold that Officer Anderson had an individualized, objective, and reasonable basis to believe that Meyer was engaged in criminal activity. Meyer's Fourth Amendment rights were not violated by the stop. We affirm.

[¶20.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.